UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FOCUSED IMPRESSIONS, INC. and FOCUSED IMPRESSIONS TECHNOLOGY, LLC,<br><br>        Plaintiffs,<br><br>                v.<br><br>THE SOURCING GROUP, LLC,<br><br>        Defendant. | Civil Action No. 1:19–CV–11307–ADB |
| THE SOURCING GROUP, LLC,<br><br>        Third-Party-Plaintiff,<br><br>                v.<br><br>CRAIG STOCKMAL<br><br>        Third-Party-Defendant. | |
| FOCUSED IMPRESSIONS, INC. and FOCUSED IMPRESSIONS TECHNOLOGY, LLC,<br><br>        Plaintiffs,<br><br>                v.<br><br>LYNN SMITH<br><br>        Third-Party-Defendant. | |

**FOCUSED IMPRESSIONS, INC.'S AND FOCUSED IMPRESSIONS TECHNOLOGY, LLC'S THIRD-PARTY COMPLAINT AGAINST LYNN SMITH**

Pursuant to Fed. R. Civ. P. 14(b), Plaintiffs Focused Impressions, Inc. ("FII") and

Focused Impressions Technology, LLC ("FIT") bring this third-party action for Breach of

Contract, Breach of the Covenant of Good Faith and Fair Dealing, Tortious Interference, violation of the Massachusetts Uniform Trade Secrets Act, and violation of the federal Defend Trade Secrets Act against Lynn Smith ("Smith"), and for their complaint state as follows:

## PARTIES

1.      Focused Impressions, Inc. is a Massachusetts corporation with a principal place of business at 800 Boylston St., Floor 16, Boston, MA  02199.

2.      Focused Impressions Technology, LLC is a Massachusetts single member limited liability company with a principal place of business at 800 Boylston St., Floor 16, Boston, MA 02199.

3.      Upon information and belief, Lynn Smith is an individual residing at 30 Penni Lane, North Andover, MA 01845.

## JURISDICTION AND VENUE

4.      Subject matter jurisdiction is appropriate pursuant to 28 U.S.C. § 1367(a).

5.      Personal jurisdiction is appropriate because Smith is a resident of Massachusetts.

6.      This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND

7.      FII was formed in 2008 in order to perform consulting services in the ecommerce industry focused in the print, marketing, and related technology space.  Beginning in 2015, FII's business consisted primarily of managing the relationships between certain clients and Liberty Mutual Insurance ("Liberty Mutual") with respect to Liberty Mutual's paper and envelope supply needs.  In short, FII would fill Liberty Mutual's paper supply needs by identifying paper sources and facilitating the delivery of the supplies to Liberty Mutual in a timely and seamless manner.

8.      Smith was employed by FII as its Chief Operating Officer ("COO") from May,

2015 until her separation from FII on November 30, 2017.  As the COO, Smith was responsible

for managing the day-to-day relationship between FII and its clients.  She was responsible for

providing and overseeing customer service, she ensured that a seamless inventory stream was

maintained for Liberty Mutual, and she managed all significant projects.

9.       FIT is a software company that was formed in 2014 to create, design, and sell

ecommerce and marketing software.

10.       Smith was a member/equity holder of FIT from February 3, 2014 through

December 1, 2017.  Similar to FII, Smith acted as FIT's COO, responsible for managing FIT's

relationships with its software clients and onboarding new clients.

11.       In or around September of 2017, Smith expressed dissatisfaction with her

continued ownership and involvement in FIT and her employment with FII.  Smith proposed that

the company buyout her membership interest in FIT, terminate her employment with FII, and

that she contract with FII to continue providing services to key customers.  The parties engaged

in negotiations, and ultimately executed a separation agreement effective December 1, 2017,

attached hereto as Exhibit A (the "Smith Agreement").

12.       The Smith Agreement included several components, including a buyout of

Smith's equity in FIT, a separation of employment from FII, mutual releases of claims, a

confidentiality provision, a non-disparagement provision, and an independent contractor

agreement.

13.       As a result of an employment termination provision in the Smith Agreement,

Section 1 entitled "Termination of Employment," Smith's employment with FII terminated on

November 30, 2017.

14.       As a result of the equity buyout provision of the Smith Agreement in Section 2

entitled "Membership Interest," Smith relinquished all membership of and equity in FIT

effective December 1, 2017.

## Independent Contractor

15.     On March 16, 2015, FII and FIT (collectively "FI") began providing relationship management services to The Sourcing Group, LLC ("TSG"), a paper sourcing and supply company, in anticipation of TSG's sales of paper products to Liberty Mutual.  That agreement is attached as Exhibit B (the "TSG Agreement").

16.     Pursuant to the TSG Agreement, FI introduced TSG to Liberty Mutual, facilitated the execution of a Master Services Agreement between TSG and Liberty Mutual, and assisted TSG in satisfying Liberty Mutual's paper supply needs that it had contracted to provide.  FI's role in the TSG Agreement was described as "the relationship manager between TSG and LMI."[1]

17.     While Smith was employed by FII, one of her responsibilities was to work on the TSG account.  Smith's responsibilities on the TSG account included management of Lena Spiegel, the FII employee responsible for replenishing and facilitating the delivery of the products Liberty Mutual purchased from TSG, communicating with Liberty Mutual and attending bi-monthly on-site meetings, resolving quality control issues, and managing the involvement of Novitex, a third-party that was temporarily involved in the Liberty Mutual paper supply line.

18.     When Smith separated from FII in 2017, the parties negotiated the terms of an independent contractor relationship that would allow Smith to continue receiving compensation for providing the services to TSG that FI was obligated to provide through the TSG Agreement.

19.     In negotiating the terms of her separation from FII, Smith argued that her services to TSG as an employee of FII were "critical," and that management of the entire TSG / Liberty

---

[1] The TSG Agreement abbreviates Liberty Mutual Insurance to LMI.

Mutual relationship "resides with [her]".  She wrote:

> My services are a critical part of the Liberty Mutual team managing the relationship at a high level, dealing daily with overall Novitex transition plans, retention materials, and resolving issues that occur. Absent my involvement, FI and FIT would have no relationship with TSG, and the above-mentioned revenue would significantly reduced [*sic*].  My role has been established since the beginning of the contract and continues today.  The facts are that the LMI publishing relationship management resides with me, and has for several years now.  The most important factors to deal with right now are relationship continuity and a common transition message to LMI.

20.     Ultimately, the parties memorialized the terms of the independent contractor relationship in Section 3 of the Smith Agreement, entitled "Smith Engagement."

21.     Pursuant to the Smith Engagement, Smith agreed to assume responsibility for FI's relationship management obligations to TSG, agreeing expressly to "manage the client relationships between FI, FIT [and] TSG on the one hand, and Liberty Mutual on the other."

22.     In consideration for her services, FII agreed to continue providing Smith with the same salary she was making as an employee, $20,000 per month, in exchange for her agreement to manage the relationship between TSG and Liberty Mutual.  The salary was adjustable after the first year of service based on the revenue FII received from TSG.

23.     On information and belief, Smith thereafter began performing her obligations.

24.     FII received no material complaints from TSG that the services provided by Smith were inadequate, and otherwise had no indication that Smith was not adequately performing her obligations to FII from December 1, 2017 through April 30, 2019.

25.     As pled in FI's Amended Complaint against TSG in this lawsuit, the relationship between FI and TSG began to deteriorate when TSG unilaterally reduced its payments to FI.  See FI's First Amended Complaint (against TSG), D. 8, p. 18/57, ¶¶ 19–24 (adopted and incorporated herein by reference pursuant to Fed. R. Civ. P. 10(c)).  Pursuant to the TSG Agreement, TSG was obligated to pay FI 65% of its profit margin on supplies sold to Liberty

Mutual, but on January 30, 2017, TSG unilaterally and without consent reduced FI's margin to 50%. Over the following months and years, TSG continued to further unilaterally reduce its payments to FI.

26.     On March 12, 2019, FI initiated this action against TSG to recover over $1,300,000 in delinquent payments owed to it under the terms of that Agreement.

27.     On April 30, 2019, TSG complained to FII for the first time that management of the Liberty Mutual relationship was inadequate. TSG claimed that

> FI materially breached Paragraph 1 of the [TSG] Agreement by failing to provide relationship management services. In fact, TSG was forced to act as the relationship manager with FI providing only modest support . . . . In short, FI failed to perform the duties it agreed to perform under the Agreement.

28.     In the same correspondence, TSG purported to terminate the TSG Agreement.

29.     TSG thereafter filed counterclaims against FI on June 3, 2019, later amending those claims on July 29, 2019 ("Amended Counterclaims"). In addition, TSG brought claims styled as third-party claims against FI's sole member/owner Craig Stockmal ("Stockmal") on June 21, 2019, and it amended those claims on August 30, 2019 ("Amended Third Party Claims").

30.     In Count I of its Amended Counterclaims, TSG alleged that FI breached the TSG Agreement by "failing to act as relationship manager with regards to the [Liberty Mutual] relationship." In connection with those responsibilities, TSG alleged that FI "failed to handle all communications with [Liberty Mutual], fail[ed] to handle inventory management, fail[ed] to handle stock replenishment, and fail[ed] to handle vendor management, thereby forcing TSG and its staff to assume responsibility over these functions." See Amended Counterclaims, Docket No. 16, ¶ 126.[2]

---

[2] All paragraphs of TSG's Amended Counterclaims (docket No. 16) that are related to allegations of breach of contract by FI are herein adopted and incorporated by reference pursuant to Fed. R. Civ. P. 10(c), including without

31.     FI contracted with Smith, with TSG's knowledge and consent, to act as relationship manager to TSG with regards to the Liberty Mutual relationship.  The TSG Agreement defines relationship management as providing "the following services: All communication with [Liberty Mutual], inventory management, stock replenishment, and vendor management."  By agreeing in the Smith Agreement to act as relationship manager to TSG, Smith agreed to perform the above functions.  According to Smith's own words prior to signing the Smith Agreement, "the [Liberty Mutual] publishing relationship management resides with me, and has for several years now."

32.     FI expressly denies any liability to TSG for breach of the TSG Agreement, but to the extent FI is determined to be liable to TSG for breach of the TSG Agreement by failing to act as a relationship manager with regards to Liberty Mutual, Smith is responsible, in whole or in part, for FI's liability to TSG pursuant to her obligations in the Smith Agreement.

### Confidentiality

33.     Section 4 of the Smith Agreement is entitled "Confidential Information," and subpart (a) defines the phrase as "any scientific, technical, trade or business secrets of [FI], and any scientific, technical, trade or business materials that [FI] treats, or is obligated to treat, as confidential or proprietary, including, but not limited to, confidential information obtained by or given to [FII] about or belonging to its suppliers, licensors, licensees, partners, affiliates, customers, potential customers or others."

34.     Section 4(b) requires Smith to "maintain in confidence and not utilize Confidential Information except in performing services for [FI]."

35.     During Smith's employment with FII, she was exposed to confidential information belonging to FII and its clients, including The Regal Press, Inc. ("Regal") and

---

limitation ¶¶ 48–65, 123–127.

Wright Business Graphics, LLC ("Wright").  This information included the exact prices that both Regal and Wright charged to Liberty Mutual for specific products.

36.     After Smith's employment with FII ended in 2017 and during her independent contracting relationship with FII, Smith became employed by TSG.  On or around December of 2017, Smith started with TSG as its Chief Marketing Officer, and on information and belief she continues working for TSG to date.

37.     During the entire relevant period, FI was providing relationship management services to TSG, Regal, and Wright in connection with their sales of paper products to Liberty Mutual.  Regal, Wright, and TSG are all competitors, to varying extents.

38.     In late 2018 and/or early 2019, Smith attempted to persuade Liberty Mutual to purchase specific envelopes from TSG that she knew, from her confidential access to Regal's information, were part of Regal's contract with Liberty Mutual.

39.     On information and belief, Smith used confidential information about Regal's pricing that she obtained during either her employment or subsequent independent contracting relationship with FII and attempted to offer TSG's products and services to Liberty Mutual at prices lower that what Regal was providing.

40.     If Smith had been successful in convincing Liberty Mutual to purchase envelopes from TSG rather than Regal, the move would have negatively impacted FI's receipt of commissions pursuant to its contractual relationship with Regal.

41.     Ultimately, Smith was unsuccessful in moving the business away from Regal.

42.     Regal discovered Smith's attempts to undercut its prices using confidential information on or around early February, 2019.  Initially, Regal believed Smith was operating at FI's direction, and on February 11, 2019 Regal threatened to hold FI and Stockmal legally responsible for any harm caused to Regal's relationship with Liberty Mutual.

43.     Regal later recognized that Smith (and not FI) was interfering with Regal's contracts for TSG's benefit, and on February 26, 2019 Regal informed Liberty of its discovery. In response, Liberty Mutual admonished Smith and TSG.

44.     In mid-2019, Smith again attempted to entice Liberty Mutual to purchases certain products from TSG rather than its competitors, and she again used confidential information to do so.

45.     This time Smith attempted to undercut Wright by offering to sell TSG's paper checks to Liberty Mutual at a lower cost than Wright was providing.  Smith had access to confidential information concerning the price of the paper checks and related products Wright sold to Liberty Mutual during her employment and/or contracting relationship with FII.  Smith used that information in an unlawful attempt to entice Liberty Mutual to do business with TSG rather than Wright.

46.     In response, Wright was forced to lower its prices for the products it provided to Liberty Mutual in order to maintain its business relationship.  As a result, FI's contractual commissions on Wright's sales to Liberty Mutual were reduced.

47.     Liberty Mutual again admonished TSG and its CEO Mr. William Caan to follow proper and established business protocols and to not circumvent Liberty Mutual's contract services or to interfere with its relationships with other parties.  Mr. Caan responded by blaming Smith for the affronting effort, and stated that he had no knowledge of and did not consent to her actions.

**Pretextual Termination**

48.     As described *supra* ¶¶ 29–30, TSG purported to terminate the TSG Agreement as a result of FI's failure to provide relationship management services.

49.     As a result of TSG's purported termination of the TSG Agreement, FI was no

longer contractually required to pay Smith commissions pursuant to the Smith Agreement.

50.     Smith herself purported to terminate the Smith Agreement on July 26, 2019, citing as a basis the loss of the TSG's Agreement which was based, in whole or in part, on Smith's failure to provide relationship management services.

51.     Thus, Smith relies on her alleged failure to perform relationship management services for FI as the basis for her termination of the Smith Agreement, which is both circular and impermissible, and ultimately is ineffectual.

52.     FI has not presently identified any damages associated with Smith's improper termination of her contract, and thus does not bring a claim for breach of contract for that reason, but Smith's conduct is consistent with her general bad-faith performance of the Smith Agreement as described elsewhere in the complaint, and demonstrates her general disregard for her contractual obligations.

## COUNT I
### (Breach of Contract – "Smith Engagement")

53.     FI repeats and incorporates by reference the allegations in Paragraphs 1 through 52 herein.

54.     As set forth above, FI and Smith entered into an agreement for services effective December 1, 2017, defined as the "Smith Agreement," and attached as Exhibit A.

55.     Pursuant to the Smith Agreement, under the header Smith Engagement, Smith was obligated to perform relationship management services in connection with TSG's relationship to Liberty Mutual.  In consideration for her services, Smith was paid compensation as defined by the Agreement.

56.      In executing the Smith Agreement and agreeing to the Smith Engagement, FI subcontracted out to Smith its obligations to TSG under the TSG Agreement with TSG's permission.

57.     Indeed, Smith was at all relevant times an officer of TSG while simultaneously contracting with FI to perform the Smith Engagement obligations.

58.     On April 30, 2019, TSG purported to notify FI that it was in breach of its relationship management obligations—the same obligations that were Smith's responsibilities pursuant to the Smith Agreement.

59.     TSG thereafter brought claims for breach of contract against FI.

60.     FI fully and expressly disputes these allegations, and believes that TSG is bringing these claims as a pretext for its failure to pay FI an outstanding balance that exceeds $1,300,000, which it owes pursuant to the TSG Agreement.

61.     Nevertheless, if it is determined by final judgment that FI breached its relationship management obligations to TSG, then Smith is responsible for breach of her obligations to FI for any failures that occurred during the tenure of the Smith Agreement.

62.     As a result of Smith's breach of contract, if so proven by TSG, FI has suffered and will suffer damages including legal fees, interest, and costs to be proven at trial.

<u>**COUNT II**</u>
**(Common Law Implied Contractual Indemnity)**

63.     FI repeats and incorporates by reference the allegations in Paragraphs 1 through 62 herein.

64.     The Smith Agreement implies a right of indemnity to FI for Smith's failure to perform her contractual obligations.

65.     If it is established that FI owes TSG damages for breach of contract, then such damages were caused by Smith's breach of the Agreement.

66.     In the event FI is found liable to TSG for breach of contract, such liability being expressly denied, then FI's liability, if any, is the result, in whole or in part, of Smith's breach of contract to FI; therefore, FI is entitled to implied contractual indemnification from Smith.

## COUNT III
### (Breach of Contract – "Confidential Information")

67.     FI repeats and incorporates by reference the allegations in Paragraphs 1 through 66 herein.

68.     As set forth above, FI and Smith entered into an agreement for services effective December 1, 2017, defined as the "Smith Agreement."

69.     Pursuant to the Smith Agreement, under the header Confidential Information, Smith was required to "maintain in confidence and not utilize Confidential Information except in performing services for [FI]."

70.     "Confidential Information" is defined by the Smith Agreement to include information "belonging to [FII's] suppliers, licensors, licensees, partners, affiliates, customers, potential customers or others."

71.     After Smith's employment with FII ended in 2017, Smith used her knowledge of Wright's pricing information in order to offer prices for TSG products that she knew would undercut the prices Wright charged to Liberty Mutual.

72.     Smith's effort was intended to convince Liberty Mutual to move its business from Wright to TSG.

73.     Smith's actions forced Wright to reduce its prices, thereby reducing its revenue from its relationship with Liberty Mutual, which ultimately reduced the payments Wright makes FI pursuant to the relationship management services FI provides for Wright.

74.     As a result of Smith's breach of contract, FI has suffered and will suffer damages including legal fees, interest, and costs to be proven at trial.

## COUNT IV
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

75.     FI repeats and incorporates by reference the allegations in Paragraphs 1 through

74 herein.

76.     The Smith Agreement was at all relevant times a valid, binding, and enforceable contract.

77.     The implied covenant of good faith requires that neither party to a contract do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

78.     Smith breached the implied covenant of good faith and fair dealing by accepting payment from FI to perform relationship management services, and then using her position and the confidential information she gained from that relationship to undercut FI's clients and to undermine FI's business relationships.

79.     Smith's actions were for her own personal gain, or for the gain of her employer TSG, to the detriment of FI.

80.     As a result of the Smith's actions, FI has suffered and continues to suffer damages including attorneys' fees, interest, and costs.

## COUNT V
### (Tortious Interference with Contractual Relationship - Wright)

81.     FI repeats and incorporates by reference the allegations in Paragraphs 1 through 80 herein.

82.     At all relevant times, FI had a contractual relationship with Wright whereby it was entitled to compensation based on Wright's sales to Liberty Mutual.

83.     Smith was aware of FI's agreement with Wright through her employment and independent contracting relationship with FI, which included, in part, servicing the day-to-day obligations that FI owed to Wright pursuant to the parties' contractual relationship.

84.     Smith interfered with the Wright Agreement by using Trade Secret Information to induce Liberty Mutual to stop purchasing products and services from Wright.  Her interference

ultimately resulted in a reduction of the commissions earned by FI.

85.     Smith's interference was intentional in that she sought to provide an economic benefit to herself and/or to TSG, a competitor of Wright to which she was employed as an officer.

86.     Smith's interference was wrongful because it was done through the use of confidential Trade Secret Information, the unauthorized use of which was prohibited by the Smith Agreement, the Massachusetts Uniform Trade Secrets Act, and the federal Defend Trade Secrets Act.

87.     Smith's interference forced Wright to reduce the cost of its goods and services to Liberty Mutual, which resulted in reduced commissions payments made by Wright to FI.  The harm is irreparable and ongoing.

### COUNT VI
**(Misappropriation of Trade Secrets in Violation of
the Massachusetts Uniform Trade Secrets Act, Gen. L. c. 93 §§ 42 et seq.)**

88.     FI repeats and incorporates by reference the allegations in Paragraphs 1 through 87 herein.

89.     FI created and maintained trade secret information within the meaning of the Massachusetts Uniform Trade Secrets Act; specifically, the prices at which Regal and Wright sold their products to Liberty Mutual (the "Trade Secret Information").  This pricing information was negotiated and set by and between either Wright or Regal, FI, and Liberty Mutual.

90.     The Trade Secret Information derives economic value, both actual and potential, from neither being known nor ascertainable through proper means by the public.  The secrecy of this information gives Regal and Wright, and by association FI, an economic advantage over their competitors, and if the information were known to the public or others, those persons could use the information to obtain economic advantage to the disadvantage of Regal, Wright, and/or

FI.

91.     For example, if a competitor knew the exact price for which Regal or Wright sold

each individual product to Liberty Mutual, the competitor could offer its products at a lower

price to the degree necessary for Liberty Mutual to determine that a change in supplier was in

Liberty Mutual's financial interests.

92.     FI's contracts with Regal and Wright entitle FI to commissions from the profit

margins generated from those companies' sales to Liberty Mutual.  If Liberty Mutual

discontinued purchases from Regal and/or Wright, or if those companies were forced to lower

their prices in order to continue providing goods and services to Liberty Mutual, FI's

commissions would be negatively affected.

93.     The contractual agreement between Wright and Liberty Mutual and between

Regal and Liberty Mutual specifies the purchase price for each of the products those companies

sell to Liberty Mutual.  Pursuant to the terms of those contracts, the purchase price shall be

maintained strictly confidential, meaning the information is not generally available to the public.

FI became privy to Wright's and Regal's pricing information as part of the relationship

management services it provides to those companies pursuant to contractual arrangements with

them.

94.     FI has taken reasonable steps to maintain the secrecy of the Trade Secret

Information.  All of its employees are required to execute standard non-disclosure agreements

("NDA") that prohibit the disclosure of confidential information, defined to include the Trade

Secret Information, and require return of confidential information if the employment relationship

ends.  Smith is the only FI employee to ever refuse to sign its NDA, and her employment with FI

ended shortly thereafter.  FI's electronic data, including the Trade Secret Information, is

protected behind secure firewall cybersecurity applications.  FI limited employee access to

sensitive information, including the Trade Secret Information, which only four FI employees

(including Smith) had access to.  Access to company workspaces are limited and decentralized,

as most employees connect through virtual portals.  Employee workstations are required to be

password protected, and access to email accounts and all systems that would contain confidential

information, including the Trade Secret Information, are password protected and subject to the

protections of the aforementioned firewall.

95.     The Smith Agreement specifically required Smith to "maintain in confidence and

not utilize" any confidential information she was privy to from FI's "suppliers, licensors,

licensees, partners, affiliates, customers, potential customers, or others."  This provision

encapsulated the Trade Secret Information that Smith used in her effort to win Wright and

Regal's business from Liberty Mutual for TSG.

96.     The requirement in the Smith Agreement to maintain the confidentiality of FI's

suppliers etc. was intended to protect the financial interests of companies for which FI performed

services, as well as FI's own financial interests, as the information could have adverse

consequences for FI if used improperly.

97.     Smith misappropriated FI's, Wright's, and Regal's Trade Secret Information

when she used her knowledge of that Information to offer prices for TSG products, a competitor

of both Wright and Regal, at an amount that she knew would undercut the prices that those

companies charged to Liberty Mutual.

98.     FI would never voluntarily permit the unprotected release of the Trade Secret

Information to the public, including its competitors or the competitors of its customers.  FI

neither authorized nor consented to Smith's unlawful use of the Trade Secret Information.

99.     Smith's misappropriation was willful as it was intended to secure an economic

advantage for her, for her employer TSG, or for both.  In addition, to the extent her

misappropriation was intended to cause economic harm to FI, it was willful.  Further, her refusal to sign an NDA prior to her separation from FI is evidence of an intent, at least at that moment, to misuse FI's confidential information.

100.     Smith had knowledge and was aware that the Trade Secret Information was confidential at minimum by virtue of executing the Smith Agreement, which contains the Confidential Information provision.

101.     Smith's misappropriation of Wright's Trade Secret Information, by using that information to undercut Wright's prices and business, caused actual economic harm to FI in the form of reduced commissions' payments from Wright.

102.     To the extent Smith was compensated or received a pecuniary or economic benefit from TSG or any other entity or person for her misuse of the Trade Secret Information, that compensation constitutes unjust enrichment.

103.     As a result of Smith's violation of the statute, FI is entitled to recover its actual harm from reduced commissions, any unjust enrichment acquired by Smith, reasonable royalty damages if applicable, FI's costs and attorney's fees, and exemplary damages of the highest available amount.

## COUNT VII
### (Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1831 et seq.)

104.     FI repeats and incorporates by reference the allegations in Paragraphs 1 through 103 herein.

105.     FI created and maintained trade secret information within the meaning of the Defend Trade Secrets Act; specifically, the prices at which Regal and Wright sold their products to Liberty Mutual (the "Trade Secret Information").  This pricing information was negotiated and set by and between either Wright or Regal, FI, and Liberty Mutual.

106.     The Trade Secret Information derives economic value, both actual and potential, from neither being known nor ascertainable through proper means by the public.  The secrecy of this information gives Regal and Wright, and by association FI, an economic advantage over their competitors, and if the information were known to the public or others, those persons could use the information to obtain economic advantage to the disadvantage of Regal, Wright, and/or FI.

107.     For example, if a competitor knew the exact price for which Regal or Wright sold each individual product to Liberty Mutual, the competitor could offer its products at a lower price to the degree necessary for Liberty Mutual to determine that a change in supplier was in Liberty Mutual's financial interests.

108.     FI's contracts with Regal and Wright entitle FI to commissions from the profit margins generated from those companies' sales to Liberty Mutual.  If Liberty Mutual discontinued purchases from Regal and/or Wright, or if those companies were forced to lower their prices in order to continue providing goods and services to Liberty Mutual, FI's commissions would be negatively affected.

109.     The contractual agreement between Wright and Liberty Mutual and between Regal and Liberty Mutual specifies the purchase price for each of the products those companies sell to Liberty Mutual.  Pursuant to the terms of those contracts, the purchase price shall be maintained strictly confidential, meaning the information is not generally available to the public. FI became privy to Wright's and Regal's pricing information as part of the relationship management services it provides to those companies pursuant to contractual arrangements with them.

110.     FI has taken reasonable steps to maintain the secrecy of the Trade Secret Information.  All of its employees are required to execute standard non-disclosure agreements

("NDA") that prohibit the disclosure of confidential information, defined to include the Trade Secret Information, and require return of confidential information if the employment relationship ends.  Smith is the only FI employee to ever refuse to sign its NDA, and her employment with FI ended shortly thereafter.  FI's electronic data, including the Trade Secret Information, is protected behind secure firewall cybersecurity applications.  FI limited employee access to sensitive information, including the Trade Secret Information, which only four FI employees (including Smith) had access to.  Access to company workspaces are limited and decentralized, as most employees connect through virtual portals.  Employee workstations are required to be password protected, and access to email accounts and all systems that would contain confidential information, including the Trade Secret Information, are password protected and subject to the protections of the aforementioned firewall.

111.    The Smith Agreement specifically required Smith to "maintain in confidence and not utilize" any confidential information she was privy to from FI's "suppliers, licensors, licensees, partners, affiliates, customers, potential customers, or others."  This provision encapsulated the Trade Secret Information that Smith used in her effort to win Wright and Regal's business from Liberty Mutual for TSG.

112.    The requirement in the Smith Agreement to maintain the confidentiality of FI's suppliers etc. was intended to protect the financial interests of companies for which FI performed services, as well as FI's own financial interests, as the information could have adverse consequences for FI if used improperly.

113.    Smith misappropriated FI's, Wright's, and Regal's Trade Secret Information when she used her knowledge of that Information to offer prices for TSG products, a competitor of both Wright and Regal, at an amount that she knew would undercut the prices that those companies charged to Liberty Mutual.

114.    FI would never voluntarily permit the unprotected release of the Trade Secret Information to the public, including its competitors or the competitors of its customers.  FI neither authorized nor consented to Smith's unlawful use of the Trade Secret Information.

115.    Smith's misappropriation was willful as it was intended to secure an economic advantage for her, for TSG, or for both.  In addition, to the extent her misappropriation was intended to cause economic harm to FI, it was willful.  Further, her refusal to sign an NDA prior to her separation from FI is evidence of an intent to misuse FI's confidential information.

116.    Smith had knowledge and was aware that the Trade Secret Information was confidential at minimum by virtue of executing the Smith Agreement, which contains the Confidential Information provision.

117.    Smith's misappropriation of the Wright's Trade Secret Information, by using that information to undercut Wright's prices and business, caused actual economic harm to FI in the form of reduced commissions' payments from Wright.

118.    To the extent Smith was compensated or received a pecuniary or economic benefit from TSG or any other entity or person for her misuse of the Trade Secret Information, that compensation constitutes unjust enrichment.

119.    As a result of Smith's violation of the statute, FI is entitled to recover its actual harm from reduced commissions, any unjust enrichment acquired by Smith, reasonable royalty damages if applicable, FI's costs and attorney's fees, and exemplary damages of the highest available amount.

**WHEREFORE**, plaintiffs Focused Impressions, Inc. and Focused Impressions Technology, LLC respectfully request that this Court:

a.    Enter judgment on all counts in plaintiffs' favor;

b.    Award the plaintiffs damages for the harms caused by Smith;

c.    Allow damages for FI's actual loss from misappropriation of its trade secrets, or award FI the value of Smith's unjust enrichment, or award FI a reasonable royalty for Smith's unauthorized disclosure of its Trade Secret Information;

d.    Award plaintiffs attorneys' fees and costs for prosecuting this action;

e.    Award exemplary damages pursuant to G. L. c. 93 §§ 42 et seq. and 18 U.S.C. §§ 1831 et seq.;

f.    Award such other relief as this Court finds appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims so triable.

PLAINTIFFS FOCUSED IMPRESSIONS, INC. AND FOCUSED IMPRESSIONS TECHNOLOGY, LLC

By their attorneys,

*/s/ Kevin T. Peters*

Kevin T. Peters, BBO #550522
kevin.peters@gesmer.com
Jason E. Armiger, BBO #685862
jason.armiger@gesmer.com
Gesmer Updegrove LLP
40 Broad Street Boston, MA 02109
Telephone:  (617) 350-6800

October 30, 2019

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon counsel of record by Electronic Court Filing on October 30, 2019.  Lynn Smith will be served process pursuant to the applicable rules of federal procedure.

*/s/ Kevin T. Peters*

Kevin T. Peters